IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 18, 2019 Session

## STATE OF TENNESSEE v. JOHNNY MORGAN DYE

**Appeal from the Circuit Court for Dickson County**
**No. 2015-CR-71    Larry J. Wallace, Judge**
_____

### No. M2018-01191-CCA-R3-CD
_____

A jury convicted the Defendant, Johnny Morgan Dye, of vehicular homicide through intoxication and vehicular homicide through reckless conduct, and the Defendant received an effective sentence of twelve years in confinement after the offenses were merged. The Defendant appeals, challenging the sufficiency of the evidence with respect to the vehicular homicide through intoxication conviction, arguing that the trial court erred in allowing certain expert testimony, and asserting that the trial court committed reversible error in the admission of evidence. After a thorough review of the record, we conclude that the evidence is sufficient and that the trial court did not err in its evidentiary decisions. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Olin J. Baker, Charlotte, Tennessee, for the appellant, Johnny Morgan Dye.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Wendell Ray Crouch, Jr., District Attorney General; and Jack T. Arnold, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant's truck crossed into oncoming traffic and caused a head-on collision with a station wagon, resulting in serious injuries to the Defendant and in the

death of the victim, Mr. Jacob Akers. The State introduced evidence that the Defendant had been travelling recklessly and at excessive speeds immediately prior to the accident, that he had admitted using heroin, that there were syringes in the vehicle, and that he tested positive for amphetamine and hydrocodone. The Defendant disputed the admission of drug use and the significance of the blood test results, and he introduced an alternative explanation for the presence of syringes.

At trial, Savannah Ladage, the victim's fiancée, testified that she and the victim had become engaged on July 4, 2014, and that the victim was preparing to attended medical school in the fall. She last saw the victim at around 7:00 or 7:30 p.m. on the day of the accident, July 7, 2014, when they met for dinner at Taco Bell.

The State presented numerous witnesses who testified to the circumstances surrounding the collision. Mr. Ronnie Dale Tibbs was driving on Highway 49 when the Defendant passed him at a rate of speed so high that it "rocked my truck like a semi truck passed it." Mr. Tibbs described himself as "a 20-year auto tech" who had experience racing cars, and he estimated that the Defendant was travelling at 100 to 120 miles per hour. The Defendant was passing Mr. Tibbs in a no-passing zone and returned to Mr. Tibbs's lane before completing the pass, causing Mr. Tibbs to slam on his brakes to avoid a collision.

Approximately three miles down the road, Mr. Tibbs came upon the scene of the accident. He approached the victim's vehicle and observed that the victim was unresponsive. He described the victim's breathing as a "gurgling" "death rattle." Mr. Tibbs' 911 call, including a statement that the Defendant had been travelling in excess of 100 miles per hour, was introduced into evidence. On cross-examination, Mr. Tibbs acknowledged that the Defendant would have had to have slowed down prior to the accident due to a series of "S" curves in the road which his vehicle would not have been able to negotiate at 100 miles per hour or more.

Ms. Jill Pardue, a nurse, witnessed the collision. The Defendant's vehicle passed her immediately before the accident, but she could not estimate the Defendant's speed, noting that she was travelling under the speed limit because her children were screaming in the back of the car. She stated that there was a rise in the road which obstructed any view of oncoming traffic. The Defendant's vehicle completed its pass of Ms. Pardue and subsequently veered into the other lane, hitting the victim's vehicle. Ms. Pardue had to slam on her brakes to avoid becoming involved in the collision. She attempted to aid the Defendant and the victim. After ascertaining that the Defendant was able to speak, Ms. Pardue approached the victim, who, before losing consciousness, asked her to tell his parents that he did not suffer.

Ms. Cyndi Chester observed the collision from her yard with two teenagers, her daughter and daughter's friend. She testified that the truck nearly hit them and that they were hit by debris. The truck was redirected when it hit a tree and came to rest by a telephone pole. The collision happened while it was light outside and the conditions were not wet. The Defendant was able to crawl out of his truck, and he was able to tell her his name and age.

Ms. Anna Cummings, Ms. Chester's daughter, confirmed her mother's testimony. She also stated that the Defendant was lying on the ground after exiting the truck, and a woman came to "visit" him. Ms. Cummings saw the woman enter the truck. Ms. Nadia Hambalek, Ms. Cummings's friend, likewise confirmed that they saw a collision and fled the careening truck and debris. Ms. Hambalek testified that the Defendant's "girlfriend or a wife or someone" came to the scene, and he asked the woman for a cigarette, which she gave him. The woman entered the vehicle and went to the glove box. Ms. Hambalek could not say whether she took anything from the vehicle, but "she did go in and came right back out and then left and then came right back." Ms. Hambalek testified that she believed the woman was not retrieving a cigarette because the woman did not enter the truck until after the Defendant had begun to smoke. Ms. Hambalek took the Defendant's cigarette away for his safety. Frantic emergency calls made by Ms. Chester and Ms. Cummings were introduced into evidence.

Mr. Jason Reed, a registered nurse employed by Vanderbilt Lifeflight, testified that he was called to the scene by other emergency personnel at 8:47 p.m. and that he assisted in transporting the Defendant to the hospital after the collision. The Defendant was given one hundred micrograms of fentanyl by emergency workers prior to Mr. Reed's arrival. Mr. Reed asked the Defendant about his current medications, and the Defendant responded that he was taking oxycodone. The Defendant's "neuro status," assessing "if [he could] answer questions [and] follow commands," was fourteen out of fifteen points, which was near normal. The Defendant's femur was noticeably deformed, and the Defendant was described as lethargic. On cross-examination, Mr. Reed acknowledged that he could not testify regarding whether oxycodone was actually present in the Defendant's system.

The trial court held a jury-out hearing on the admissibility of the testimony of Ms. Amanda Hawn, who was married to the Defendant at the time of the collision, regarding a bag of syringes she discovered in the remains of the truck. Ms. Hawn testified that she came upon the collision scene by happenstance after the Defendant refused to contact her and she decided to drive around to find him. She retrieved the Defendant's telephone from the truck. She stated that in the days following the accident, the Defendant asked her persistently to get his work bag from his truck, ostensibly because it contained the vehicle title. With permission from the district attorney's office, she visited the lot where

the vehicle was kept and retrieved the bag. The bag contained no papers, only tools and an open bag of unused syringes. Ms. Hawn stated she felt she had been "betrayed and set up" and that she took photographs of the contents of the bag. She could not say why the dates on the photographs showed that they were taken on July 6, 2013. Ms. Hawn at first testified that the Defendant acknowledged heroin use to her, but she later stated that his actual words were that he had "made a mistake." She understood this statement to be a reference to heroin use. The trial court excluded Ms. Hawn's testimony that the Defendant acknowledged heroin use and that she discovered burnt spoons in her garage, but it ruled the testimony regarding the syringes admissible.

The trial court also evaluated the admissibility of the testimony of Ms. Hawn's mother, Ms. Patricia Arnold, who testified regarding the Defendant's acknowledged drug use. Ms. Arnold asserted that the Defendant had exchanged text messages with her regarding his attempt to reform by selling his pain medication rather than using it. During a subsequent telephone call, he told her he had used heroin either on the day of the collision or the day before the collision. The trial court excluded the text messages as prejudicial but concluded the Defendant's statements about heroin were admissible.

Ms. Hawn subsequently testified before the jury that the Defendant continually and persistently asked her to get the work bag from the pickup after the collision for the purported reason that the title of the vehicle was inside. She stated that she felt around inside the bag and could not feel paper, so she dumped out the contents. In addition to work tools, she found a bag of insulin needles. The Defendant did not take insulin. Ms. Hawn identified her photographs of the work bag and syringes and acknowledged that the date stamps on the photographs were inaccurate but that she could not explain the inaccuracies. She stated that the Defendant's coworkers would not have had access to his truck because all the workers would ride to a job site together in a company vehicle. Ms. Hawn testified that she filed for divorce in September 2015 but later agreed she was mistaken about the year and that she filed for divorce shortly after the collision.

Ms. Arnold testified that during a telephone conversation, the Defendant acknowledged having made bad decisions. She stated that "the subject came up about him using black tar heroin, and I asked him did he do it, and he said yes." The Defendant told her that he had used heroin either on the day of or the day before the accident, but due to her shock over discovering his drug use, she could not remember which.

Trooper Fidencio Medina investigated the scene for the Tennessee Highway Patrol. He determined that the Defendant's truck had crossed into oncoming traffic and hit the station wagon. He collected photographs and video evidence. Trooper Medina also executed a search warrant on July 9, 2014, to obtain a blood sample which the

hospital had taken as part of the Defendant's treatment.[1]  Ms. Elisa Grady, assistant manager in specimen receiving at Vanderbilt University Medical Center, confirmed that she delivered the sample to Trooper Medina and stated that the identity of the donor is verified by the laboratory prior to labeling the sample.  Exhibits entered into evidence reveal that the blood was collected at 9:37 p.m. on the day of the collision.  Trooper Medina delivered the sample to the Tennessee Bureau of Investigation ("TBI").

Former Special Agent Holly Carrell, a forensic scientist in toxicology, tested the Defendant's blood sample for the TBI.  Ms. Carrell testified that she had a master's degree in chemistry from Vanderbilt University, where she studied drug design and development and "how [different drugs] act on the body."  Her TBI training included studying how to test for drugs and the effects of these drugs on the human body.  The Defendant did not object to Ms. Carrell as an expert witness.

The gist of Ms. Carrell's testimony was that she tested only the sample of the Defendant's blood that was available to her, which was less than the standard sample size used by the machine in conducting analysis.  Due to the insufficiency of the sample's size, the machine was unable to report a result reliably quantifying the amount of the substances in the Defendant's blood.  The import of her testimony was that the result obtained from the machine only allowed her to testify that the Defendant's blood tested positive for amphetamine and hydrocodone and that she could not testify to the quantitative value of these substances in the Defendant's blood.  She could not testify regarding whether, had she had a full sample size, the test results would have been above or below the machine's lowest calibrator of 0.05 mcg/ml.  Neither could she testify regarding whether the quantities of amphetamine and hydrocodone in the blood were over the therapeutic threshold of 0.03 mcg/ml, at which the subject could experience side effects, or below that threshold.  Ms. Carrell could offer no testimony on whether or not the Defendant was impaired.  Ms. Carrell testified that the TBI does not conduct testing for heroin but normally sends the sample to another laboratory, and the sample in this case was not tested for heroin.  In essence, she testified that, due to insufficient sample size, the machine was only able to produce a positive or negative result for amphetamine and hydrocodone in the Defendant's blood, and the result was positive.

Ms. Carrell further testified regarding the effects of the drugs at issue.  She stated that amphetamine is a stimulant and that it can cause nervousness, jitteriness, increased risk-taking, and hallucinations.  Hydrocodone is an opiate and central nervous system depressant.  Its effects include sedation, dizziness, slurred speech, increased reaction

---

[1] The record reveals that law enforcement conducted a separate blood draw from the Defendant without a warrant after the collision, but the Defendant moved to suppress the blood evidence, and the State only sought to introduce the blood obtained from the hospital pursuant to a warrant.

time, decrease in critical judgment, and loss of balance. She stated that the two types of drugs would not cancel each other out, and a person under the influence of both could experience an increased risk-taking at the same time as an increase in reaction time and a decrease in critical judgment. Over the Defendant's objection to relevance, she testified that the effects of heroin would be similar to the effects of hydrocodone. The Defendant did not otherwise object to Ms. Carrell's testimony regarding the effects of the drugs in question. She acknowledged that she could not say how any individual person would be affected by the drugs and that a person might not experience all or any side effects. Ms. Carrell stated that hydrocodone is not the same as oxycodone, although the drugs have similar effects.

Trooper Harold "Skip" Stewart, a member of the Critical Incident Response Team with the Tennessee Highway Patrol, testified that he was able to use forensic mapping tools to reconstruct the collision. The collision occurred in the victim's lane of travel and was an offset head-on collision which caused both vehicles to rotate. Trooper Stewart could not determine the speeds of the vehicles but could determine that the Defendant's vehicle was traveling faster than the victim's. He calculated that if, instead of colliding with the victim, the Defendant had slammed on his brakes at the collision point and slid to a stop at the truck's final resting place, his initial speed would have been between 57 and 60 miles per hour, but this calculation did not include any speed loss that would come from the collision with the victim or the tree. As far as Trooper Stewart could determine, the collision's cause was not mechanical.

Lieutenant Troy Human interviewed the Defendant at the Defendant's home on August 20, 2014, after his release from the hospital. The recorded interview was introduced into evidence. The Defendant told Lieutenant Human that lack of sleep was not a factor in the collision. Asked to describe the day, he stated that he went to work at 6:00 a.m., returned home at around 3:00 p.m., and received a telephone call from a relative asking him to deliver some shoes to his father, who was in jail. On the way home from the jail, he assisted a friend who had run out of gas. The Defendant could not recall the circumstances around the collision. He told Lieutenant Human he had only acquired the truck, which belonged to his father, the night before. The Defendant acknowledged that on the day of the collision, he had taken oxycodone, which he took orally in fifteen mg doses four times a day as prescribed. He believed he had taken two doses that day. He also acknowledged that he had "snorted" Lortab in the past but denied blood testing would reveal any drugs other than oxycodone. Lieutenant Human testified that the Defendant only seemed remorseful at the end of the interview, and he acknowledged that the Defendant was still in a wheelchair at the time of the interview.

Sergeant Craig Smith, of the Tennessee Highway Patrol criminal investigations division, obtained a recording of a telephone conversation between the Defendant and his

father through the Cheatham County Sheriff's Department. Portions of the recording were played for the jury. The Defendant agreed with his father that he had "f***ed up." The Defendant's father asked, "F***ed up, wasn't you?" The Defendant responded, "Nah, I really wasn't." He explained that he was driving fast and was in the opposing lane of traffic coming over the hill.

Dr. Feng Li, the Chief Medical Examiner for Davidson County, introduced the autopsy findings. The victim died of multiple blunt force injuries on July 7, 2014, at 10:05 p.m. The victim's injuries included fractures to the skull, lacerations to the brain, subarachnoid hemorrhage, blunt force injuries to the torso, including rib and pelvic fractures, an accumulation of blood in the chest cavity, and blunt force injuries to the extremities, including fractures to both femurs. There were no drugs or alcohol in the victim's blood.

The Defendant's mother, Ms. Connie Sue Butler, testified that the Defendant only obtained the pickup truck a day or two before the collision. The pickup truck belonged to the Defendant's father, and he kept the title to the truck inside the vehicle. The Defendant's father used syringes for a medical condition. Ms. Butler testified that the Defendant's father's medication, syringes, and other personal items were in the truck. She acknowledged that she was found guilty of insurance fraud in 2015, but she testified that she did not burn down a house to obtain the insurance. She agreed that she lied to the court by saying she was guilty in order to get out of jail.

The Defendant's sister, Ms. Brandy Danielle Ferrell, stated that the Defendant stayed with her after he was released from the hospital. He was confined to bed and needed help to speak on the phone. She testified that she would have overheard any conversations between the Defendant and Ms. Arnold about heroin and that she did not hear any such conversation.

The jury convicted the Defendant of vehicular homicide by intoxication, a Class B felony, and of vehicular homicide by recklessness, a Class C felony. The offenses were merged, and the Defendant was sentence to serve twelve years in prison for vehicular homicide by intoxication.

The Defendant moved for a new trial, alleging that the evidence was insufficient to support the verdict, that the trial court had erred in permitting Ms. Carrell to testify as an expert witness or to testify about the general effects of opiates, and that the admission of the syringes was error. The trial court denied the motion, and the Defendant appeals.

# ANALYSIS

The Defendant asserts on appeal that the evidence was insufficient to support the element of intoxication in the vehicular homicide through intoxication conviction, that the trial court erred in allowing expert testimony regarding the effects of the drugs found in the Defendant's system, that the trial court erred in admitting the testimony regarding the syringes, and that the trial court erred in admitting the testimony regarding the Defendant's recent use of heroin.

## I. Sufficiency of the Evidence

The Defendant contends that there was insufficient evidence supporting the element of intoxication in his conviction for vehicular homicide by intoxication. We conclude that, viewing the evidence in the light most favorable to the State, the evidence is sufficient to support the verdict.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and the reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). We note that the Defendant challenges the admission of certain evidence, but "the sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which may have been improperly admitted." *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008).

Vehicular homicide is defined as "the reckless killing of another by the operation of an automobile, airplane, motorboat or other motor vehicle." T.C.A. § 39-13-213(a). When vehicular homicide is the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person, it is a Class C felony. T.C.A. § 39-13-213(a)(1), (b)(1). When vehicular homicide is the proximate result of the driver's intoxication, it is a Class B felony. T.C.A. § 39-13-213(a)(2), (b)(2)(A). Intoxication under the statute includes drug intoxication and is further defined, by reference to the DUI statute, to include driving:

> [u]nder the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess.

T.C.A. § 55-10-401(1); T.C.A. § 39-13-213(a)(2).

Here, the evidence established that the Defendant's vehicle struck the victim's vehicle in the victim's lane of traffic at the crest of a hill. Mr. Tibbs testified that, shortly before causing the collision, the Defendant had been travelling at unsafe speeds in excess of 100 miles per hour. Mr. Tibbs further stated that he narrowly avoided a collision with the Defendant when the Defendant attempted to return to Mr. Tibbs's lane of travel prior to completely passing his vehicle. Ms. Pardue testified that she saw the Defendant veer into the oncoming lane when he crested the hill and that the hill obstructed any view of oncoming traffic. This testimony is sufficient to establish vehicular homicide through conduct creating a substantial risk of death or serious bodily injury to a person, and the Defendant does not challenge this conviction.

The Defendant contends that because the State could not establish the quantity of hydrocodone and amphetamine in his system, the evidence was not sufficient to support the conviction for vehicular homicide by intoxication. We note parenthetically that the Defendant is incorrect in implying that the testing proved the drugs were present in below-therapeutic levels or stating that testing showed the amounts were "insufficient," or "negative."[2] Agent Carrell's testimony was instead simply that the drug test was positive, meaning that drugs were present in the Defendant's system. Because the blood sample's insufficient size made it impossible for her to fix the numeric quantity, the only testimony she could offer was that the drugs at issue were present in the Defendant's system. She could not state whether the drugs were above or below the lower therapeutic

---

[2] The Defendant is correct that they were "unquantifiable," in that no numeric quantity could be assigned to the amounts.

boundary and could not testify regarding impairment. She also testified that the sample was not tested for heroin. In sum, she stated that the testing she performed was, per force, a positive/negative test and that the result was positive for amphetamine and hydrocodone.

Addressing the sufficiency of the evidence and viewing it in the light most favorable to the State, we observe that the Defendant's driving demonstrated signs of impairment, including passing where prohibited, failure to maintain his lane on two occasions, veering into the oncoming lane where visibility was obscured by a hill, and excessive speed. The evidence further established that the Defendant told both medical personnel and Lieutenant Human that he had not consumed any medication other than his prescribed oxycodone. However, these statements were belied by the presence of amphetamine and hydrocodone in his system. Agent Carrell testified regarding the effects of the drugs, which corresponded with the driving behaviors exhibited by the Defendant, including excessive risk-taking and poor judgment. The lifeflight report described the Defendant as lethargic. According to Ms. Arnold, the Defendant acknowledged using heroin either the day of or the day before the collision, and testing was not performed to either confirm or refute the presence of heroin in his blood. Furthermore, the Defendant acted deceptively in instructing his wife to retrieve a bag from his vehicle under the pretense that it contained papers when it in fact contained hypodermic needles and tools.

Unlike the statute for a per se DUI violation, the statute at issue did not require the State to establish the quantity of drugs present in the Defendant's system, only that he was under the influence of an intoxicant which impaired his ability to safely operate a motor vehicle by depriving him of the clearness of mind and control of himself that he would otherwise possess. *See State v. Kevin Allen Fleming*, No. E2016-01746-CCA-R3-CD, 2018 WL 1433503, at *5-6, *26 (Tenn. Crim. App. Mar. 22, 2018), *perm. app. denied* (Tenn. July 18, 2018) (concluding that the evidence of intoxication in a vehicular homicide was sufficient when testing could not quantify the amount of hydrocodone and cocaine in the defendant's blood but only give a positive or negative and when his blood alcohol level was 0.07 percent); *State v. Moses*, 701 S.W.2d 629, 631 (Tenn. Crim. App. 1985) (evidence was sufficient to support intoxication even absent testing when the defendant had driven erratically before the accident, the accident took place in the center of the roadway, and the defendant appeared intoxicated based on his walk, speech, and belligerent manner, because testing "was but a factor for the jury to consider"); *see also State v. Travis Wilson*, No. E2013-00371-CCA-R3-CD, 2014 WL 3817074, at *14 (Tenn. Crim. App. Aug. 4, 2014) (upholding the conviction when the defendant performed adequately on field sobriety tests, a TBI agent was able to testify only as to the presence rather than the quantity of bath salts in the defendant's system, the defendant's behavior

appeared intoxicated, he acknowledged ingesting bath salts, and he had alprazolam in an amount slightly greater than a therapeutic amount in his system).

This court has previously upheld a finding of intoxication where there was evidence of the use of an intoxicant and impairment but no evidence of the quantity of the intoxicant. *See State v. Michael James Amble*, No. E2016-02495-CCA-R3-CD, 2018 WL 1989632, at *4 (Tenn. Crim. App. Apr. 27, 2018), *perm. app. denied* (Tenn. Sept. 13, 2018) (officer's testimony that the defendant smelled of alcohol, that his speech was slurred, that his eyes were bloodshot, and that he performed poorly on field sobriety tests was sufficient to support conviction); *State v. Johnathan Christopher Carey*, No. M2014-02373-CCA-R3-CD, 2015 WL 8482746, at *11 (Tenn. Crim. App. Dec. 10, 2015) (the smell of alcohol and the defendant's erratic driving, slurred speech, and confusion sufficiently supported the conviction when the defendant intentionally blew improperly into the breathalyzer). Viewing the evidence in the light most favorable to the State, the evidence established that the Defendant had consumed heroin, hydrocodone, and amphetamine, and moreover that he attempted to conceal his consumption of these substances by not acknowledging their use to medical personnel or law enforcement and by attempting to secrete the syringes. The Defendant proceeded to drive erratically and caused a collision by swerving into oncoming traffic. A rational trier of fact could have inferred that the Defendant's driving was impaired by the substances he had consumed. Accordingly, while the proof of intoxication is certainly not overwhelming, we conclude it is sufficient to uphold the conviction.

## II. Expert Testimony Regarding General Effects of Drugs

The Defendant challenges Ms. Carrell's expert testimony regarding the general effects of the drugs found in his system and the general effects of heroin. The State correctly notes that the Defendant failed to object to the testimony and asserts he is not entitled to plain error relief. We agree that the Defendant has not established that he is entitled to plain error relief.

At trial, the State presented Ms. Carrell's qualifications and asked that she be permitted to give expert testimony. Ms. Carrell holds a master's degree in chemistry from Vanderbilt University, where her studies included the effects of different drugs on the human body. Furthermore, her TBI training included both training regarding performing drug tests and training regarding the effects of these particular drugs on human physiognomy. Defense counsel was given the opportunity to question Ms. Carrell after she affirmed that she was trained regarding the effects of certain drugs on the human body, but he declined to do so, affirmatively stating he had no objections to her being qualified as an expert. Neither did he object to her testimony about the general effects of amphetamine and hydrocodone on the human body, instead lodging only a limited

objection to the relevance of her testimony regarding the effects of heroin. Accordingly, this issue is waived. *See* Tenn. R. App. P. 36(a).

For an error to constitute plain error sufficient to merit relief, the following factors must be present: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome of the trial.'" *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (quoting *Adkisson*, 899 S.W.2d at 642). A court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). We conclude that the Defendant has failed to establish that the issue was not waived for tactical reasons or that the trial court breached a clear and unequivocal rule of law.

In general, "[w]hen a party does not object to the admissibility of evidence, … the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000) (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)). The rationale behind this rule is that an objection may allow the opposing party to remedy any issues and make the evidence competent; otherwise, a party could withhold an objection until appeal, to its advantage. *Welch v. Bd. of Prof'l Responsibility for the Sup. Ct. of Tenn.*, 193 S.W.3d 457, 464 (Tenn. 2006). Here, absent any objection from the defense, the State did not present further evidence bolstering Ms. Carrell's expertise regarding the clinical side effects of the drugs associated with the Defendant through blood testing and testimony. Accordingly, there may have been a tactical advantage in delaying a challenge to the testimony, and it is not clear that this issue was not waived for tactical purposes.

Moreover, the Defendant has not established that admitting the testimony breached a clear and unequivocal rule of law. A trial court has broad discretion regarding the admissibility of expert testimony. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). The appellate court will find an abuse of discretion when the trial court has applied an incorrect legal standard, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the party complaining. *State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2009).

Under Tennessee Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

- 12 -

experience, training, or education may testify in the form of an opinion or otherwise." Evidence requires expert testimony if it concerns a matter that "'the average juror would not know, as a matter of course....'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). The trial court, however, is required to exclude the expert testimony "if the underlying facts or data indicate a lack of trustworthiness." Tenn. R. Evid. 703. The trial court's gatekeeping function is meant "to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The Defendant asserts that the trial court erred in allowing testimony regarding the general effects of the drugs without explicitly evaluating the following factors:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*State v. Ferrell*, 277 S.W.3d 372, 378 (Tenn. 2009) (quoting *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997)).

We observe that expert testimony must be relevant and reliable, as measured by any of the *McDaniel* factors that are applicable, by the expert's qualifications, and by the straightforward connection between the expert's knowledge and the basis for the opinion. *State v. Stevens*, 78 S.W.3d 817, 834-35 (Tenn. 2002). Expert testimony may take the form of scientific theory or methodology, or may simply be "specialized knowledge." *Id.* at 832. Depending on the nature of the testimony, "the *McDaniel* factors *may* apply, subject to the discretion of the trial court, 'as reasonable measures of the reliability' of all expert testimony described in Rule 702." *Id.* at 834 (quoting *Kumho Tire Co.*, 526 U.S. at 152). Accordingly, the trial court was not required to specifically consider each factor; instead, its role was to ensure that the witness was qualified to give expert testimony as gauged by any reasonable measures of the reliability of the testimony, including whether there was a "straightforward connection between the expert's knowledge and the basis for the opinion." *Id.* at 835. "[T]he court may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by 'a rational explanation which reasonable [persons] could accept as more correct than not correct.'" *Id.* at 834 (quoting *Wood v. Stihl*, 705 F.2d 1101, 1107-08 (9th Cir. 1983)). Here, Ms. Carrell

testified that she had studied the effects of the drugs at issue both through her graduate coursework at Vanderbilt and as part of her general training at TBI and then testified regarding the effects of the drugs. The admission of this testimony did not breach a clear and unequivocal rule of law. *See Travis Wilson*, 2014 WL 3817074, at \*10-11 (concluding that the trial court did not err in permitting one TBI agent to testify to the general effects of alprazolam when he testified he had studied the effects of drugs on humans and did not err in permitting another TBI agent to testify regarding the general stimulant effects of bath salts despite the fact that the data had not been subjected to controlled dosage study because the substance was too dangerous to ingest). We conclude that the Defendant is not entitled to plain error relief.

### III. Admission of Testimony Regarding Heroin and Syringes

The Defendant next asserts that the admission of Ms. Arnold's testimony regarding his use of heroin and the admission of Ms. Hawn's testimony regarding the syringes constitutes reversible error. Defense counsel objected to Ms. Arnold's testimony at the time but did not raise the issue in his motion for a new trial. He acknowledges that it must be reviewed under the standard for plain error. We conclude that the trial court did not abuse its discretion in admitting the testimony and that the Defendant is not entitled to plain error relief.

The Defendant asserts that the testimony regarding his use of heroin was unreliable because it was not corroborated and that the prejudicial impact substantially outweighed the probative value. He also asserts, without further elucidation, that it is not relevant. Although the trial court excluded certain text messages in which the Defendant acknowledged selling his pills after the accident, the trial court allowed Ms. Arnold to testify that, in discussing the collision, the Defendant admitted that he had made a mistake and also admitted that he had used heroin either on the day of the crash or on the day before.

Here, the Defendant has not established that a clear and unequivocal rule of law was breached or that consideration of any error is necessary for substantial justice. *See Adkisson*, 899 S.W.2d at 641-42. A trial court's decisions regarding the admissibility of evidence are generally reviewed for abuse of discretion. *State v. Parker*, 350 S.W.3d 883, 896-97 (Tenn. 2011). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).

In order to be admissible, evidence must first be relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. "'Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (quoting *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quotation omitted)). Like other decisions regarding the admissibility of evidence, decisions regarding the relevance of evidence are reviewed for abuse of discretion. *State v. Watson*, 227 S.W.3d 622, 649 (Tenn. Crim. App. 2006); *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003).

Ms. Arnold's testimony that the Defendant acknowledged using heroin on the day of the collision or the day before the collision has a tendency to make the existence of his intoxication at the time of the collision more probable. We conclude that the trial court did not err in finding the testimony relevant. Neither did it abuse its discretion in balancing the probative and prejudicial value of the testimony. The evidence did not tend to inflame the jury's passions or appeal to its biases or sympathies but was probative on the issue of whether or not the Defendant was intoxicated. Accordingly, we conclude that it was properly admitted. Furthermore, the Defendant cites no authority for the proposition that Ms. Arnold's testimony regarding her conversation with the Defendant had to be corroborated, and we are aware of none. *See*, *e.g.*, *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) (rejecting contention that corroboration was required for victim's testimony); *State v. Ball*, 987 S.W.2d 859, 861 (Tenn. Crim. App. 1998).

The Defendant also asserts that the trial court should not have permitted Ms. Hawn to testify regarding the syringes found in the vehicle. In addition, the Defendant argues that the testimony and photographs should have been excluded because the State did not authenticate them or establish a proper chain of custody. The State responds that a chain of custody was not required and that the evidence was properly admitted.

Tennessee Rule of Evidence 901 discusses the requirement of authentication prior to admissibility. Evidence should not be admitted if its identity and integrity cannot be demonstrated by chain of custody or other appropriate means. *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000). However, the requirement that evidence be authenticated is limited to tangible evidence. *See State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (noting that a condition precedent to the introduction of tangible evidence is the witness's ability to identify it or establish a chain of custody); *State v. Jeremy McMillon*, No. E2010-01091-CCA-R3-CD, 2011 WL 4424732, at *8 (Tenn. Crim. App. Sept. 22, 2011) ("In the case herein, the bullet at issue was never actually entered into evidence …. Therefore, the bullet itself is not tangible evidence …, and there was no need for authentication."). The requirement of authentication "is satisfied by evidence sufficient

- 15 -

to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Such evidence can include the testimony of a witness establishing the identity of the item offered into evidence. Tenn. R. Evid. 901(b)(1). Ms. Hawn was able to authenticate the photographs by identifying them as the ones she took and stating that they accurately portrayed what she found in the bag after she retrieved it from the wrecked truck. *See State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996) (photographs were sufficiently authenticated by a witness who testified that they fairly and accurately portrayed the scene). The Defendant questioned her regarding the discrepancies in the dates printed on the photographs in order to raise doubts about her testimony. We conclude that Ms. Hawn's testimony sufficiently authenticated the photographs. *See* Tenn. R. Evid. 901(a), (b)(1). There is no merit to the Defendant's argument regarding the chain of custody of the syringes themselves, because they were not introduced into evidence and the State accordingly did not have to establish a chain of custody. *Cannon*, 254 S.W.3d at 296.

The Defendant also challenges the evidence regarding the syringes on the basis of relevance. The trial court held a jury-out hearing and determined that Ms. Hawn could give evidence regarding the syringes in the vehicle but could not testify regarding burnt spoons she found in her garage. Ms. Hawn testified that the Defendant continually and persistently asked her to retrieve his work bag from the vehicle, ostensibly to obtain the vehicle's title. Ms. Hawn had to ask permission from the district attorney and ultimately accessed the impounded vehicle to retrieve the bag. She discovered that the bag did not contain any papers related to the vehicle. Instead, it contained the Defendant's tools and a bag of opened but unused syringes. Ms. Hawn testified that she photographed the items immediately, concerned that she had been misled into removing evidence from the truck. She also, however, disposed of them. The Defendant exhibited signs of impairment while driving and his blood tested positive for amphetamine and for hydrocodone. He did not have prescriptions for these medications and had denied taking any medication other than oxycodone prior to the collision. He did not have a medical condition requiring the use of syringes. On the other hand, he acknowledged using heroin shortly before the collision. The Defendant cross-examined Ms. Hawn about the dates on the photographs which appeared to show that the photographs were taken a year prior to the collision. He also offered evidence that the syringes belonged to his father, who had been driving the truck in the days prior to the collision. The presence of the syringes with the Defendant's tools inside his work bag tended to make the Defendant's intoxication more probable than it would otherwise be, particularly in light of his acknowledgement of heroin use. Based on the evidence before it, the jury could have inferred that the Defendant was attempting to conceal evidence related to the intravenous use of drugs. We also conclude that the trial court did not abuse its discretion in weighing the probative value against the potential prejudice. Like the testimony about heroin, the testimony regarding the syringes and the accompanying photographs were not particularly

inflammatory but had probative value on the question of intoxication. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning, we affirm the trial court's judgments.


_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE